IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

ANTHONY E.[1],                                                No. 1:18-cv-01518-HZ

        Plaintiff,

  v.

COMMISSIONER, SOCIAL                            OPINION & ORDER
SECURITY ADMINISTRATION,

        Defendant.

John E. Haapala, Jr.
401 E. 10th Avenue, Suite 240
Eugene, Oregon 97401

     Attorney for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

Renata Gowie
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

Martha A. Boden
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

    Attorneys for Defendant

HERNANDEZ, District Judge:

    Plaintiff Anthony E. brings this action seeking judicial review of the Commissioner's

final decision to deny disability insurance benefits (DIB) and supplemental security income

(SSI).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. §

1383(c)(3)).  I reverse the Commissioner's decision and remand for additional proceedings.

## PROCEDURAL BACKGROUND

    Plaintiff protectively applied for SSI and DIB on April 2, 2015, alleging an onset date of

May 31, 2012.  Tr. 23 (noting protective filing dates); Tr. 208-18 (DIB); Tr. 219-24 (SSI).  His

applications were denied initially and on reconsideration.  Tr. 71-85, 101 (DIB Initial); Tr. 86-

100, 102 (SSI Initial); Tr. 143-48 (Both Initial); Tr. 103-19, 137 (DIB Recon.); Tr. 120-36, 138

(SSI Recon.).  On September 13, 2017, Plaintiff appeared, with counsel, for a hearing before an

Administrative Law Judge (ALJ).  Tr. 41-70.  On October 4, 2017, the ALJ found Plaintiff not

disabled.  Tr. 20-40.  The Appeals Council denied review.  Tr. 1-7.

## FACTUAL BACKGROUND

    Plaintiff alleges disability based on having neuropathy in his feet, arthropathy of a lumbar

facet joint, degeneration of a lumbar intervertebral disc, lumbar spondylosis, osteoarthritis of his hips, Raynaud's Syndrome, gout, and Type II diabetes. Tr. 241. At the time of the hearing, he was forty-four years old. Tr. 45. He completed his GED and "some college." *Id.*

SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if

not, the Commissioner proceeds to step four. *Yucker*t, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined, for purposes of Plaintiff's DIB claim, that Plaintiff met the insured requirements of the Social Security Act (SSA) through March 31, 2017. Tr. 25. The ALJ also found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. *Id.* Next, at step two, the ALJ determined that Plaintiff had the following severe impairments: Type II diabetes mellitus, diabetic peripheral neuropathy, degenerative disc disease of the lumbar spine, and osteoarthritis of the bilateral hips and knees. Tr. 25-27. At step three, the ALJ found that Plaintiff's impairments did not meet or equal, either singly or in combination, a listed impairment. Tr. 28.

At step four, the ALJ concluded that Plaintiff has the RFC to perform sedentary work with the following limitations: he can occasionally climb ramps and stairs; he can never climb ladders, ropes, or scaffolds; he can frequently balance and stoop; he can occasionally kneel,

crouch, and crawl; he should avoid concentrated exposure to extreme cold and extreme heat; and he should avoid even moderate exposure to hazardous machinery and unprotected heights. Tr. 28. With this RFC, the ALJ determined that Plaintiff is unable to perform any of his past relevant work. Tr. 33. However, at step five, the ALJ determined that Plaintiff is able to perform jobs that exist in significant numbers in the economy such as final assembler, optical goods; routing clerk; and call out operator. Tr. 34-35. Thus, the ALJ determined that Plaintiff is not disabled. Tr. 35.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

/ / /

DISCUSSION

Plaintiff alleges that the ALJ erred by (1) finding his subjective limitations testimony not credible; (2) rejecting the opinion of examining physician Ruth Lowengart, M.D.; and (3) rejecting the opinion of treating Family Nurse Practitioner (FNP) Laura Johnson.

## I. Plaintiff's Credibility

The ALJ summarized the written testimony in Plaintiff's April 2015 Activities of Daily Living Function Report, including that his impairments affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, concentrate, use his hands, and get along with others. Tr. 29 (citing Tr. 263). The ALJ also noted that in a July 2015 appeals report, Plaintiff alleged worsening symptoms because he had to stop taking his medications due to side effects. *Id.* (citing Tr. 283).

The ALJ next summarized Plaintiff's hearing testimony. *Id.* The ALJ noted that due to a gunshot wound when he was seventeen years old, in which a bullet became lodged in his spine, Plaintiff has difficulty navigating stairs and suffers from lower back pain limiting his movement. *Id.* Plaintiff also testified that he suffers from neuropathy of the saphenous nerve as well as diabetic neuropathy. *Id.* The neuropathy began as a tingling sensation but progressed to a burning pain. *Id.* He elevates his legs to alleviate his symptoms and must elevate his legs with prolonged sitting. *Id.* The ALJ further noted Plaintiff's testimony that he can lift about fifty pounds but can carry only about ten pounds because he uses a cane. *Id.* Plaintiff uses a cane to ambulate whenever he leaves his home. *Id.* He testified that he can sit for thirty minutes before needing to change position. *Id.* He lies down every hour for ten to fifteen minutes to relieve his symptoms. *Id.* He can walk about a block and stand in place with a cane for ten minutes. *Id.*

His driving is limited.  *Id.*

Plaintiff also testified that he started taking insulin two years before the hearing and at the time of the hearing, he required three to five insulin shots each day.  *Id.*  He takes Lyrica for nerve pain.  *Id.*  He takes no narcotic pain medications.  *Id.*  The ALJ also noted Plaintiff's testimony that he lives in a mobile home by himself.  Tr. 30.  He can prepare his own simple meals.  *Id.*  He can wash his dishes.  *Id.*  He is able to water his garden and flowers for about fifteen minutes daily.  *Id.*

The ALJ is responsible for determining credibility.  *See Vasquez*, 572 F.3d at 591.  Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  *Carmickle v. Comm'r*, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on 'clear and convincing reasons'"); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility:  First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations,

the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain. *Id.*; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in *Molina*:

> In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation. For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.] While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.] Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

*Molina*, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

Here, the ALJ articulated the first step of the two-step inquiry and found that Plaintiff's impairments could reasonably cause his alleged symptoms. Tr. 31. However, at the second step,

the ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects" of his symptoms were "not entirely consistent with the medical evidence and the other evidence in the record for the reasons explained in this decision." *Id.* He continued by stating that Plaintiff's "statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence." *Id.* Given the ALJ's findings, the issue in this case, where there is no evidence of malingering, is whether the ALJ provided clear and convincing reasons, supported by substantial evidence in the record, for failing to credit Plaintiff's symptom testimony.

In addition to the general statements noted in the prior paragraph, the ALJ gave three specific reasons in support of his negative credibility determination: (1) Plaintiff's activities of daily living were inconsistent with his alleged limitations; (2) Plaintiff was not consistently compliant with treatment recommendations; and (3) physical exams and medical records did not support his allegations, including his need for a cane. Tr. 31-32.

A. Activities of Daily Living

The ALJ wrote that although Plaintiff testified that he could not drive longer than "a mile or so to the store," he also testified that the office of his primary care provider was located thirty-two miles from his home. Tr. 31. Without citing to a particular record, the ALJ referred to "medical records from March 2015" which noted that Plaintiff attended a medical appointment without his wife because she was working, and he did not indicate that he was accompanied by anyone else. *Id.* This, the ALJ reasoned, suggested that Plaintiff drove himself to the appointment which is inconsistent with his allegations regarding his limited driving ability and inability to sit for prolonged periods of time. *Id.* The ALJ also stated that Plaintiff's ability to

live independently in a dwelling by himself was not entirely consistent with his allegations of severe exertional limitations. *Id.*

Plaintiff argues that the ALJ's reasons are not clear and convincing. The medical record from "March 2015" the ALJ referred to appears to have been from May 2015 and does not affirmatively state that Plaintiff drove himself to the appointment. Tr. 453. It does not state that Plaintiff was alone and unaccompanied by anyone. Instead, it states that Plaintiff's wife did not accompany him to the appointment because she started a new job that day. *Id.* Other records from appointments with FNP Johnson show that Plaintiff's wife typically accompanied him when he was being examined by FNP Johnson. *E.g.*, Tr. 465, 474. Plaintiff notes that other evidence in the record refers to Plaintiff's mother driving him to appointments. Tr. 816 (Aug. 2017 chart note from Dr. Lowengart). Plaintiff argues that without an express reference to Plaintiff driving himself to this single appointment, it is just as likely that Plaintiff's mother provided transportation as it is that Plaintiff drove himself. Plaintiff adds that just because he was alone during the actual medical appointment does not establish that he drove himself there. Furthermore, even if he did drive himself on one occasion, he adds that a single appointment at which he was unaccompanied does not contradict other testimony.

As to his ability to live independently, Plaintiff notes that the record shows that Plaintiff's mother cleans his house and he has additional help from a neighbor. Tr. 816 (Aug. 2017 Dr. Lowengart chart note). Plaintiff's wife left him because she had "had enough of taking care of him." *Id.* Thus, Plaintiff argues, he lives alone but clearly requires assistance from others.

Defendant argues that the fact that Plaintiff lives alone and has the ability (1) to travel independently to the medical clinic which is more than thirty miles away, and (2) to make simple

meals and vacuum, are activities inconsistent with Plaintiff's testimony that he has severe limitations in standing, driving, sitting, and that he must lie down frequently. In reply, Plaintiff suggests that Defendant misconstrues the record because, as Plaintiff already noted, he requires assistance from others and his mother drove him to appointments.

I agree with Plaintiff that the ALJ erred in finding Plaintiff's activities to be inconsistent with his allegations. While the ALJ correctly noted that Plaintiff lived alone, he neglected to cite to evidence in the record that Plaintiff's wife provided assistance before she left him, that Plaintiff's mother cleans his house, and that he often has assistance from a neighbor. The ALJ's interpretation of the record, suggesting that Plaintiff manages his daily life and care of his home completely independently, is inaccurate.

Additionally, if the record affirmatively established that Plaintiff drove himself more than thirty miles to his May 2015 appointment with FNP Johnson, that would contradict his testimony that he cannot drive more than about one mile. But, the record shows that others regularly drove him to his appointments and the May 2015 appointment chart note states only that his wife did not accompany him into the meeting with the practitioner. It does not state that he drove himself. The ALJ's interpretation of the chart note is not consistent with the other evidence in the record. Moreover, the ALJ found that Plaintiff's ability to drive himself to that appointment contradicted his testimony about limitations in driving and sitting. The ALJ does not explain why driving thirty-two miles is inconsistent with Plaintiff's testimony that he can sit for about thirty minutes. Depending on the drive, that distance may take just about that amount of time. The ALJ also does not explain how, even if he were correct, Plaintiff's driving activity on one specific date undermines his testimony related to other non-driving and non-sitting limitations such as his

need to lie down throughout the day due to pain or that he would miss two to three days of work per month. Overall, the ALJ's rejection of Plaintiff's testimony based on an inconsistency with his daily activities is not a clear and convincing reason based on substantial evidence in the record.

B. Inconsistent Compliance with Treatment

The ALJ next addressed Plaintiff's testimony that he suffered severe limitations even though he had good medication compliance. Tr. 32. The ALJ found that Plaintiff did not show proper compliance with medication and diet. *Id.* In support, the ALJ first cited to a January 2015 examination with FNP Johnson in which Plaintiff reported that changes he made to his diet helped him feel better as his blood sugar dropped. Tr. 473. The ALJ also noted that in April 2015, Plaintiff began to use insulin to control his diabetes. Tr. 457.[2] But, according to the ALJ, in August 2015, Plaintiff reported that he still did not have a glucose meter. Tr. 627. The ALJ determined that failure to possess a glucose meter was inconsistent with Plaintiff's allegations that he was monitoring his blood sugar after switching to insulin. The ALJ next cited to a November 2015 record where Plaintiff reported he had not checked his blood glucose levels in two days and had not administered his insulin during that time either. Tr. 632. Then, the ALJ stated, in a March 2016 medical appointment, Plaintiff admitted to eating candy bars and processed carbohydrates, which the ALJ described as non-compliant with his treatment regimen and causing him to have a glucose level of 600. Tr. 639. The ALJ concluded that these instances showed that Plaintiff did not strictly comply with his "diabetic treatment regime," undermining

---

[2] The ALJ misread the record. April 2015 is when Plaintiff learned to self-administer his insulin injections. Tr. 457. But, he had been on insulin since the prior November. Tr. 482. Before he could do it himself, his wife administered the injections. Tr. 474, 476.

his assertion that he experiences disabling-level symptoms while being medically compliant. Tr. 32 ("This evidence of the claimant's reportedly improved symptoms with compliance to his treatment plan does not support the claimant's allegations of disabling limitations despite strict compliance to his diabetic treatment regime and reasonably supports the residual functional capacity assessed above.").

Plaintiff argues that the ALJ erred in rejecting his hearing testimony that he has taken his medication as prescribed since 2012. Pl.'s Reply 5, ECF 18. His testimony, to be precise, was that he was about eighty-five percent compliant with taking his insulin. *Id.* He was not 100% compliant because sometimes he slept through his normal meal time and if he does not eat a meal, he does not take his insulin. Tr. 62. The ALJ asked Plaintiff whether, since May 2012, there had been a "period of time where you just didn't take your medication at all for your diabetes?" *Id.* Plaintiff answered, "no, I've never gone a time where I haven't - - not taken it." *Id.* The ALJ next asked about unspecified "notes in the file" suggesting that Plaintiff was non-compliant with taking medication which worsened his diabetic neuropathy. *Id.* Plaintiff explained that this was not a non-compliance issue but instead, was a problem with ineffective medication. Tr. 63. He explained that he was taking metformin orally for the first two years of his diagnosis and then in 2012, he began taking insulin. *Id.* He's been "following the rules" since switching to insulin. *Id.* Plaintiff suggests that the evidence cited by the AL J does not undermine his testimony.

Defendant repeats the ALJ's arguments, citing to records purportedly showing that Plaintiff did not own a glucose meter, did not administer insulin regularly, and continued to eat candy bars, processed carbohydrates, and drink beer. Def.'s Br. 9, ECF 14. This resulted in

elevated blood sugar levels, six times the normal range. *Id.* at 15 (citing Tr. 639).

The ALJ's reasoning is not supported in the record. First, the record cited by the ALJ and Defendant which allegedly shows Plaintiff's non-compliance with his insulin injections reveals that Plaintiff's insurance does not cover needles and syringes and that he had run out of them a couple of days before his medical appointment. Tr. 632. Thus, he had not used his insulin for two days and as a result, he had not checked his glucose in two days. *Id.* An inability to afford syringes and needles, which are required to administer the medication, is not a valid basis upon which to find a claimant non-compliant with medication.

Next, the record cited by the ALJ and Defendant as supposedly establishing that Plaintiff failed to maintain a diabetic diet, shows that Plaintiff lives on a limited income and runs out of fresh foods by the end of the month. Tr. 639. As a result, he "resorts to sandwiches, pasta and pizza at which his glucose levels rise about 500." Tr. 639 (further noting he is noncompliant about food and stating he "lives quite far out and often by the end of the month runs out of fresh food and resorts to pasta and sandwiches."). Although this March 2016 chart note includes Plaintiff conceding that he has an occasional beer and candy bar, *id.,* the record also shows that he was drinking less than one beer per month and trying to avoid sugar. Tr. 632. Overall, this record shows Plaintiff struggling to maintain compliance with a healthy diet on a limited income while living quite rurally. It does not reveal an intentional or complete disregard of medical advice.

Finally, there is an August 2015 chart note that states that Plaintiff does not have a glucose meter. Tr. 627. But, this is inconsistent with the numerous references to Plaintiff regularly checking his glucose several times per day. *E.g.*, Tr. 652 (March 2017 reports glucose

levels to provider); Tr. 637 (March 2016 reports testing once per day); Tr. 421 (Jan. 2015 reports testing at least two times per day); Tr. 481 (Nov. 2014 reports his home testing glucose average as 265). In October 2014, there is a reference to Plaintiff's glucose meter not being delivered and a need to follow through with "insurance issues." Tr. 484, 486. During that time, there is also a reference to his using his mother-in-law's meter to check his glucose two times per day. Tr. 486. The chart reference to not having a glucose meter is repeated, verbatim, in a March 2016 chart note. Tr. 637. It is part of what appears to be boilerplate language which also includes another inconsistency by stating that the "patient" is not on insulin therapy when he clearly was. Given the repeated references to Plaintiff regularly testing his glucose, an indication that a meter had been ordered for him, and his previously using his mother-in-law's meter, the record reasonably indicates that the reference to his not having a glucose meter is in error.

When the record is examined as a whole, it does not reasonably support a finding that Plaintiff is non-compliant with this treatment. The only instance of his not taking insulin and not testing his glucose was when he ran out of syringes and needles which are not covered by his insurance. The lack of a glucose meter is an inaccurate record. He has in fact regularly tested his glucose. And, while Plaintiff is not 100% compliant with his diet, he had worked to improve it, limited his alcohol, limited his sugar, and stressed that at the end of the month when he was low on income, he resorted to pasta, pizza, and sandwiches rather than fresh foods which cost more. None of the evidence cited by the ALJ supports a finding that Plaintiff's symptom testimony is undermined by willful non-compliance with medical treatment.

C. Medical Evidence

The ALJ cited to two types of records in determining that the medical evidence did not

support Plaintiff's alleged limitations.[3]  First, he found that although Plaintiff alleged "very severe exertional limitations regarding his ability to sit, stand, and walk, his physical exams do not entirely support these allegations."  Tr. 31 (citing Tr. 628, 633, 639).  Second, he cited to records which he suggested showed only sporadic mention of a cane as well as normal gait and normal ambulation.  *Id.*  According to the ALJ, these contradicted Plaintiff's testimony that he needs a cane.

As to the "physical exam" records, the first record cited by the ALJ is an August 2015 chart note by FNP Johnson stating, among other things, that Plaintiff's skin was normal, his lungs were normal and clear, his blood pressure was normal, his heart was normal, he had no abdominal tenderness, and that his ankle and pedal pulses were "2+ bilaterally."  Tr. 628. According to the National Institutes of Health, a pedal pulse of 2+ suggests a slightly more diminished pulse than normal.  https://www.ncbi.nlm.nih.gov/books/NBK350/.  The record also states that his "CRT" was greater than three seconds.  *Id.*  "CRT" presumably refers to "capillary

---

[3]  In defending the ALJ's decision, Defendant cites to other portions of the ALJ's decision citing additional medical records.  Def.'s Br. 9.  But, only the "physical exam" and cane-related records are specifically cited by the ALJ in support of his rejection of Plaintiff's subjective testimony as they are the only ones that actually follow the finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms are not consistent with the medical and other evidence.  Tr. 31.  To the extent the ALJ's discussion of the medical evidence preceding that finding was intended to be further support for rejecting Plaintiff's testimony, that intention is unclear.  In any event, the four paragraphs of medical evidence discussion preceding the credibility finding does not amount to a clear and convincing reason to reject Plaintiff's testimony because it is a summary of the medical evidence and does not analyze or explain why the evidence is inconsistent with particular portions of Plaintiff's testimony.  Tr. 30-31 (stating conclusion that the "objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations;" stating conclusion that "[o]verall, the medical evidence of record discussed above reasonably supports the residual functional capacity assessed above"); *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015) ("ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his [RFC] determination").

refill time," the "time taken for color to return to an external capillary bed after pressure is applied to cause blanching." https://en.wikipedia.org/wiki/Capillary_refill. Normal capillary refill time is usually less than two seconds. *Id.* A prolonged time can indicate decreased peripheral perfusion or peripheral artery disease. *Id.* Finally, the record states that he had no deficit in sensation in his feet or ankles and had no ulceration. Tr. 628.

The next record, dated November 2015, is also from FNP Johnson and reports identical findings as the August 2015 chart note, with the additional observation that a part of Plaintiff's right foot was swollen, red, and abnormal. Tr. 633. The third of the three "physical exam" records cited by the ALJ is to a March 2016 record from FNP Johnson. Tr. 639. On the page cited by the ALJ (Ex. 17F/27), FNP Johnson noted that Plaintiff had a swollen right big toe, although he retained full range of motion, and had an area of keratosis on another toe which was cleaned and debrided, after which there was no apparent ulceration but there was some dead tissue. Tr. 639. His A1C was reported to have increased. *Id.* It is unclear what part of this record the ALJ relied on to state that this physical exam was inconsistent with Plaintiff's allegations. Perhaps the ALJ meant to refer to the prior page, which is identical to the November 2015 record he also cited. Tr. 638.

Clearly, these records do not show entirely normal physical exams. The 2+ bilateral pedal pulses, the CRT time, and the instances of swelling and keratosis on his feet are not normal. Because the ALJ did not specify, it is unclear what parts of these records he found to undermine what part of Plaintiff's testimony. The only possible link apparent to this Court is that the lack of deficit in sensation in Plaintiff's feet could possibly be inconsistent with his allegations that his peripheral neuropathy, meaning the tingling and burning he feels in his feet,

affects his ability to stand and walk.  But, the ALJ himself did not explain the connection.  He

did not sufficiently describe why three instances of no sensation deficit, out of several years of

medical records, undermined Plaintiff's testimony.  Additionally, his finding was that these

physical exams did "not entirely support" Plaintiff's allegations.  With this phrasing, the ALJ

suggests that the records still support some degree of limitation, but the ALJ failed to explain

what degree and what specific exertional function.

The records the ALJ cited regarding the cane and normal gait and ambulation include a

September 2015 chart note from a consulting gastroenterologist to whom FNP Johnson referred

Plaintiff because of nausea and vomiting issues.  Tr. 738-42.  The specific page cited by the ALJ

notes that Plaintiff "uses a cane."  Tr. 741.  The ALJ also cited to a duplicate of this record.  Tr.

31 (citing Ex. 15F/11, 20F/4).  In June 2017, as  the ALJ noted, a physical examination by

Richard Eddy, M.D., did not mention a cane.  Tr. 31 (citing Tr. 661-62).  Additional records

noted by the ALJ referred to a normal gait or normal ambulation.  Tr. 332 (Aug. 2012 chart note

indicating Plaintiff was ambulating normally); Tr. 311-12 (Feb. 2015 chart note stating Plaintiff

had normal gait).

Plaintiff notes that the evidence is replete with references to his need for and use of a

cane.  *E.g.*, Tr. 531 (Aug. 2015 RFC by FNP Johnson opining that Plaintiff needed a cane while

engaging in occasional standing and walking); Tr. 791 (June 2017 RFC by FNP Johnson again

opining that Plaintiff needed a cane while engaging in occasional standing and walking); Tr. 544

(Dr. Lowengart opining in a March 2015 RFC that Plaintiff needed a cane for occasional walking

and standing); Tr. 538 (Dr. Lowengart March 2015 physical examination noting that Plaintiff's

gait was slow with no limp, showed poor balance, and that he was unable to stand unassisted on

one leg without significant risk of falling); Tr. 812 (Dr. Lowengart opinion in an August 2017

RFC that Plaintiff needed a cane to walk on uneven ground or to walk very far); Tr. 533, 559

(Sept. 1, 2015 chart note from Timothy Driver, M.D. noting that Plaintiff used a cane); Tr. 9-12

(report of February 2018 examination by Douglas Blaty, D.O., stating that Plaintiff used a cane

for ambulation throughout the room and stating that "[w]hen he tries to ambulate without the

cane in the office he has significant difficulty with what appears to be balance and weakness of

his legs"); Tr. 15 (Dr. Blaty opining that a cane was medically necessary for Plaintiff based on

Dr. Blaty's "objective findings of poor balance on gait testing and inability to perform several gait

maneuvers, such as, tandem gait or walking on heels and toes along with his diabetic peripheral

neuropathy and chronic low back pain, and left leg exertional weakness").  Additionally, a March

2015 record cited by the ALJ states that unspecified neurological tests showed a normal gait, Tr.

762, but this record also stated that Plaintiff was completely unable to comply with heel to toe

walking.  Tr. 760.

The ALJ failed to discuss evidence contrary to his conclusory finding that the objective

evidence supported his RFC.  The record contains evidence of abnormal physical exams.  The

record contains evidence of the use of a cane as well as a need for a cane.  By pointing to isolated

records without a discussion of additional, relevant evidence, the ALJ did not meet his burden to

provide specific, clear, and convincing reasons to reject Plaintiff's subjective testimony.  *See*

*Mahmood v. Comm'r*, 61 F. Supp. 3d 982, 989 (D. Or. 2014) ("ALJ may not cherry-pick" from

the medical record but must consider "entire diagnosis and observations") (citing *Ghanim v.*

*Colvin*, 763 F.3d 1154 , 1164 (9th Cir. 2014)).

In summary as to Plaintiff's credibility, the ALJ erred when he relied on Plaintiff's activities, his alleged non-compliance with medical treatment, and isolated medical records, to find Plaintiff's testimony not credible.

## II. Medical Opinions

Plaintiff argues that the ALJ improperly rejected the opinions of Dr. Lowengart and FNP Johnson.

### A. Dr. Lowengart

Dr. Lowengart examined Plaintiff on two occasions. In March 2015, her physical examination showed poor balance, slow gait, and an inability to stand unassisted on one leg without significant risk of falling; atrophy of the left thigh; normal appearing joints; a "genu recurvatum" of the left knee due to "prolonged abnormal gait due to the leg weakness"; reduced sensation to the left foot and left outer thigh as well as in the right foot to the ankle; and reduced strength in the left hip flexors and left quadriceps due to previous gunshot wound. Tr. 538-39. She noted that January 2015 x-rays of Plaintiff's hips and October 2014 x-rays of his knees showed mild osteoarthritis and a 2014 lumbar spine x-ray showed mild diffuse degenerative disc and joint pathology, most notably at L2-3. Tr. 539. Further, she noted that 2014 nerve conduction studies showed moderate peripheral neuropathy and evidence of previous chronic femoral neuropathy of the left leg, with saphenous sensory neuropathy on the left. *Id.*

Based on her examination and review of Plaintiff's records, she assessed him with several impairments and then opined that he was disabled from most gainful employment at that time and for at least another two years. *Id.* She indicated, however, that if Plaintiff's diabetes and neuropathy were better controlled, he might be able to return to work in a semi-sedentary

capacity.  *Id.*  More specifically, she opined that he was limited to ten minutes of standing or walking; he could not walk up hills or on uneven ground; he could not climb stairs or ladders; he could sit for thirty to forty-five minutes before needing to get up and move around; he had limits in his driving abilities; he could lift up to twenty pounds occasionally; and he could do only small amounts of light housework.  Tr. 539-40.

In August 2017, Dr. Lowengart again examined Plaintiff.  Tr. 815-19.  She noted that he was now taking Lyrica which was helping his neuropathy pain but its side effects included fatigue, dizziness, swelling of the hands and feet, and hand numbness.  Tr. 185.  This time, her physical examination showed that he had a slow gait, with a limp that "tends to lock left knee." Tr. 817.  He used a cane when going out of the house.  *Id.*  She noted that he had poor balance and was unable to stand unassisted on one leg without significant risk of falling.  *Id.* Additionally, he was unable to do a heel or toe walk.  *Id.*  She again noted his left thigh quadriceps atrophy.  *Id.*  She found the range of motion of his musculoskeletal system reduced, noting specific issues with his lumbar spine, cervical spine, knees, and hips.  *Id.*  She found reduced sensation in the "distal extremities to the knees bilateral in the lower extremities[.]" *Id.* He had reduced sensation of the left inner and outer thigh.  Tr. 817-18.  He continued to have reduced strength in his left hip flexors and left quadriceps due to his prior gunshot injury.  Tr. 818.  A straight leg test which did not produce sciatic pain in 2015, Tr.  539, produced sciatic pain on the left in the 2017 exam.  Tr. 818.  She noted a more recent 2017 lumbar spine x-ray which now showed moderate disc degeneration and osteophytes at L2-3, "progressed from prior." *Id.*

Dr. Lowengart opined that Plaintiff could stand or walk up to ten to fifteen minutes.  Tr.

818. He could sit for thirty minutes but then he has to get up and move around. *Id.* He needs to elevate his feet. *Id.* He had driving limitations. *Id.* He could lift up to thirty pounds occasionally, with no lifting from the floor because he cannot squat. *Id.* Generally, she opined that he was "totally disabled" due to his medical conditions, particularly his neuropathy, osteoarthritis, and degenerative disc disease with sciatica. Tr. 819.

In an accompanying form, Dr. Lowengart stated that Plaintiff's prognosis was poor. Tr. 809. She cited the following clinical findings: numbness in his hands and feet; weakness in left leg with thigh atrophy; poor balance; reduced range of motion in the neck, lumbar spine, knees, and hips; absent reflexes in the ankles; nerve conduction studies showing moderate peripheral neuropathy and left femoral neuropathy; x-rays confirming mild osteoarthritis of knees, hips and spine; and the x-ray confirming lumbar spondylosis worse at L2-3, progressed since 2014. Tr. 810. She opined that his pain and symptoms would frequently interfere with the attention and concentration required to perform simple work tasks. Tr. 811. She believed he could perform low stress jobs. *Id.* She opined that he could walk less than one block before needing to rest, that he could sit thirty minutes at one time, stand fifteen minutes at one time, and could stand/walk a total of less than two hours and sit a total of about four hours in an eight-hour day. *Id.* She believed he would need to walk five minutes every thirty minutes during an eight-hour day. Tr. 811-12. She stated that Plaintiff would need to take unscheduled breaks of fifteen to thirty minutes two to three times per day and would need to elevate his legs with any prolonged sitting. *Id.* She opined he would miss about four days of work per month as a result of his impairments. Tr. 813.

The ALJ summarized Dr. Lowengart's 2015 and 2017 opinions. Tr. 32-33. The ALJ did

not assign a weight to the 2015 opinion. *Id.* The ALJ gave Dr. Lowengart's 2017 opinion "little weight" because (1) she examined Plaintiff only two times; (2) her opinions were "not consistent with the objective medical evidence of record, including his recent lumbar spine x-ray and his occasionally normal physical examinations." Tr. 33 (citing Tr. 628, 633, 639, 661-62, 793-94).

"'To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence.'" *Ryan v. Comm'r*, 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)) (brackets in *Ryan*). "'If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Ryan*, 528 F.3d at 1198).

Plaintiff argues that the ALJ erred because he failed to specifically identify what evidence actually contradicted Dr. Lowengart's opinion. Plaintiff contends that Dr. Lowengart's 2017 opinion expressly considered Plaintiff's change in condition from 2014/15 to 2017. Plaintiff reasons that as a result, the latter opinion considered the occasional normal physical examinations. As to the lumbar x-ray, the one specific piece of evidence the ALJ cited, Plaintiff argues that Dr. Lowengart's observations correlated with that x-ray and were not contradicted by it.

The August 1, 2017 lumbar x-ray showed lumbar vertebrae which remained normal in height and alignment. Tr. 793. There were no new compression fractures and no different significant subluxations. *Id.* However, there was now moderate disc space narrowing and osteophytosis at L2-3. *Id.* Multiple tiny metallic densities were still apparent at L4-5. *Id.*

Overall, the x-ray showed "[m]oderate localized degenerative disc disease at the L2–3 level increased since the previous exam." *Id.*

There are four "normal physical examination" records cited by the ALJ, excluding the 2017 lumbar spine x-ray. They are (1) a June 2017 chart note from Dr. Eddy; Tr. 660-62; (2) a March 2016 chart note by FNP Johnson; Tr. 637-39; (3) a November 2015 chart note by FNP Johnson; Tr. 632-35; and (4) an August 2015 chart note by FNP Johnson. Tr. 627-30. Dr. Eddy's chart note contains several normal findings such as no edema in Plaintiff's extremities. Tr. 661. But, that same chart note states that Plaintiff's arterial pulses were only 2/4 and that his tuning fork vibratory test score was only 3/15. Tr. 662. Given that the purpose of Dr. Eddy's examination was to follow-up on diabetes care and that these two abnormal test results most directly correlate to Plaintiff's diabetic neuropathy, the fact that other portions of the chart note show normal findings does not contradict Dr. Lowengart's opinion regarding limitations caused by Plaintiff's neuropathy.

FNP Johnson's chart notes have been previously discussed above. They do not contain completely normal physical exams. Tr. 638 (Mar. 2016 chart note showing ankle and pedal pulses at 2+ bilaterally and capillary refill time of greater than three seconds along with abnormal right toe joint); Tr. 633 (Nov. 2015 chart note showing same); Tr. 629 (Aug. 2015 chart note noting bilateral 2+ ankle plus foot edema). While they do also remark that there was no deficit in sensation, Tr. 628, 633 638, it is obvious that the records do not show a normal physical exam.

In addition to these records, Defendant, in response to Plaintiff's argument, cites to an August 2015 record not cited by the ALJ which shows improving A1C test results. Def.'s Br. 5 (citing Tr. 629). Defendant suggests that this shows that Plaintiff's blood sugar was better

controlled with diet and medication management, and that this undermines Dr. Lowengart's opinion that Plaintiff was unable to drive or sustain a full-time work schedule due to back and lower extremity pain and numbness. *Id.* In reply, Plaintiff cites to other records which show worsening A1C results. *E.g.*, Tr. 634 (Nov. 2015 chart note stating that Plaintiff's A1C is "greatly increased"); Tr. 690 (Apr. 2016 chart note stating that Plaintiff's A1C was "terrible").

The ALJ's findings that Dr. Lowengart's opinions were "not consistent with the objective medical evidence of record, including his recent lumbar spine x-ray and his occasionally normal physical examinations" is not supported in the overall record. As discussed here, what the ALJ refers to as the occasionally normal physical examinations included abnormal findings. The ALJ failed to identify which portions of the cited records undermined which specific opinions given by Dr. Lowengart. Additionally, the 2017 lumbar spine x-ray was also abnormal and expressly stated that as to the L2-3 area, Plaintiff's condition had worsened since his previous x-ray in 2014. And, as Plaintiff notes, his A1C level was not routinely stable or improved.

The only other reason given by the ALJ for rejecting Dr. Lowengart's opinions is that Dr. Lowengart saw Plaintiff only two times. Dr. Lowengart, as an examining physician, actually saw Plaintiff more than many examining physicians who see a patient only one time. As a result, she was able to compare his 2015 condition and test results with his condition in 2017. This gave her a better appreciation for his longitudinal record than most examining physicians are able to have. Without more, the fact that Dr. Lowengart saw Plaintiff only twice as an examining physician is not enough to discredit the entirety of her opinions.

B. FNP Johnson

FNP Johnson was Plaintiff's treating practitioner. She provided two statements opining

that Plaintiff's diabetic neuropathy symptoms prevented him from performing full-time work. Tr. 529-32 (Aug. 2015); Tr. 789-92 (June 2017). In the 2015 assessment, she indicated that Plaintiff could walk less than one block before needing to rest, could sit two hours at one time if his feet were elevated, could stand at one time for fifteen minutes before needing to sit or walk, could stand/walk for a total of two hours in an eight-hour day, and could sit at least six hours in an eight-hour day. Tr. 530. She opined that he would need to shift positions from sitting, standing, or walking at will, and would need to take unscheduled breaks throughout the day for ten to twenty minutes each hour. *Id.* She stated that while engaging in occasional standing or walking, he would need a cane. Tr. 531. He could frequently lift twenty pounds or less, and occasionally lift fifty pounds. *Id.* He could never climb ladders; he could occasionally climb stairs; and he could rarely crouch, squat, or bend. *Id.* He could occasionally twist. *Id.* FNP Johnson also believed that Plaintiff would be "off task" twenty-five percent or more of a typical workday. Tr. 532. She opined that he would have good days and bad days and that he would miss more than four days each month as a result of his impairments. *Id.*

In the June 2017 assessment, FNP Johnson indicated that Plaintiff had moderate to severe pain or paresthesias in his bilateral feet and ankles. Tr. 789. She opined he could walk less than one block before experiencing pain or needing to rest. Tr. 790. He could sit ten minutes at one time before needing to get up and could stand ten minutes at one time before needing to get up. *Id.* She further assessed Plaintiff as being able to sit for a total of less than two hours in an eight-hour day, and to stand/walk for a total of two hours in an eight-hour day. *Id.* He needed a job that allowed shifting positions at will from sitting, standing, or walking, and needed to walk for five minutes every ninety minutes. *Id.* She opined that he would need to take unscheduled

breaks of five to twenty minutes throughout the day. *Id.* She assessed him with restrictions of occasionally lifting twenty pounds or less but never lifting fifty pounds. Tr. 791. He could occasionally twist, rarely stoop, and never crouch or squat. *Id.* She repeated her opinions that Plaintiff would have good days and bad days and would miss more than four days per month because of his impairments. Tr. 792.

The ALJ referred to both of FNP Johnson's functional assessments. Tr. 32. He granted the opinions "little weight". *Id.* In support, the ALJ gave three reasons: (1) the 2015 opinion was internally inconsistent; (2) the 2017 opinion was inconsistent with Plaintiff's past work activity; and (3) the opinions were not "entirely consistent" with the "objective evidence in the record," including the 2017 lumbar spine x-ray showing "no central canal stenosis or neural foraminal narrowing," and Plaintiff's occasional normal physical examinations. *Id.* (citing Tr. 628, 633, 639, 661-62, 793-94).

Under social security regulations governing the weight to be accorded to medical opinions, "acceptable medical sources" include licensed physicians and licensed psychologists, but not nurse practitioners. 20 C.F.R. §§ 404.1513(a), (d)(1); 416.913(a), (d)(1).[4] Nurse practitioners are deemed to be "other sources." *Id.* Under Ninth Circuit law, evidence from "other sources" is considered under the same standard as that used to evaluate lay witness testimony, meaning the ALJ may reject it for reasons germane to the witness. *Molina*, 674 F.3d at 1111 (because physician's assistant was not an acceptable medical source, ALJ could discount

---

[4] Because Plaintiff's claim was filed before March 2017, these are the applicable regulations. *See* 20 C.F.R. §§ 404.1527, 416.927 (2018) (applicable to claims filed before March 27, 2017 and referring to statements from "acceptable medical sources" and "not acceptable medical sources"); 20 C.F.R. §§ 404.1513, 416.913 (2015) (more specifically delineating acceptable and non-acceptable medical sources).

physician's assistant's opinion for germane reasons); *Dale v. Colvin*, No. 03:13-cv-01187-HZ, 2014 WL 1917980, at *7 (D. Or. May 13, 2014) (because nurse practitioner was an "other source," ALJ could reject opinion for germane reasons).

In Social Security Ruling (SSR) 06-03p, available at 2006 WL 2329939, the SSA recognized that "[w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." *Id.* at *3. The SSA recognized that "[o]pinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.*

Medical sources who are not "acceptable medical sources" may not establish the existence of a medically determinable impairment, but, "information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* at *2. Factors for consideration of such other medical sources include: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion. *Id.* at *4-5. Generally, the adjudicator "should explain the weight given to

opinions from these 'other sources[.]'" *Id.* at *6; *see also Revels v. Berryhill*, 874 F.3d 648, 655 (9th Cir. 2017) (citing 20 C.F.R. § 404.1527(b), (f) and SSR 06-03p, court explained that "[t]he same factors used to evaluate the opinions of medical providers who are acceptable medical sources are used to evaluate the opinions of those who are not" and further summarizing the factors as "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the doctor").

Plaintiff argues that none of the reasons cited by the ALJ find support in the record and therefore, they are not "germane" reasons sufficient to reject FNP Johnson's opinions. Additionally, Plaintiff contends that the ALJ failed to engage in a discussion of the relevant factors under SSR 06-03-p.

Defendant argues that the ALJ appropriately considered the factors in SSR 06-03p by noting that FNP Johnson was Plaintiff's treating nurse practitioner who had examined Plaintiff on more than one occasion. Defendant contends this shows that the ALJ acknowledged the nature and extent of the treating relationship. By discounting the opinions because they were inconsistent and unsupported by the record, Defendant argues that the ALJ adequately considered the regulatory factors. Defendant further argues that the ALJ's findings of internal inconsistency and contrary normal physical findings were germane reasons, supported by the record, and therefore, the ALJ did not err in giving little weight to FNP Johnson's opinions.

I agree with Plaintiff. The alleged internal inconsistency relied on by the ALJ is from FNP Johnson's 2015 functional assessment. There, FNP Johnson opined that Plaintiff could sit for up to two hours at a time with his feet elevated and that he would require hourly unscheduled

breaks for ten to twenty minutes. Tr. 530. The ALJ found these statements to be inconsistent. They are not. The two cited limitations were provided in answers to separate questions. *Id.* One question asked for an opinion on the total length of time the patient could sit. *Id.* The other asked about the need to take unscheduled breaks during the work day. *Id.* In response to the first question, FNP Johnson clearly stated that the maximum sitting time was two hours "*with feet elevated.*" *Id.* (emphasis added). The response to the second question had no such condition and thus, it assessed the need for breaks without any accommodation such as elevating feet. The reasonable interpretation of the record is that Plaintiff is able to sit for two hours at one time if he can have his feet elevated but otherwise, he will need to take unscheduled breaks every hour.

Second, the ALJ found that FNP Johnson's opinion that Plaintiff was limited from 1998 forward was contradicted by his work history which showed that he continued to work at the light to medium level after that date. Plaintiff points to evidence in the record that in his most recent job, his employer accommodated his impairments. In his April 2015 Disability Report, Plaintiff explained that his last job was at Lost Creek Marina which included a living arrangement and an accommodation of his limitations because he was allowed to work some from home. Tr. 242 (further stating that "the owner worked with me"). Then, the owner sold the business and the new owners were not willing to allow special considerations. *Id.* Because the new owners "[w]anted more labor than [Plaintiff] could do," they let him go. *Id.* He also testified that in a different job he held for several years beginning in 2000, he was eventually let go "due to some of the complications I was having and medications I was taking and cut backs." Tr. 47. The uncontested testimony and evidence shows that Plaintiff was let go of one job because of his condition and that his impairments were accommodated at another job. This

evidence does not undermine FNP Johnson's opinion that he was limited to at least sedentary work since 1998.

The medical evidence the ALJ cites in support of his rejection of FNP Johnson's opinions is the same as the evidence he cited in support of rejecting Dr. Lowengart's opinions. For the reasons discussed above, the cited records do not show entirely normal physical examinations and thus, they are not inconsistent with FNP Johnson's assessment.

Finally, while the ALJ did note the nature of the treating relationship and that FNP Johnson had personally seen Plaintiff on more than one occasion, he did not specifically state how long FNP Johnson had been treating Plaintiff, how frequently she had seen him, how well her opinions were explained, how consistent or inconsistent they were with other record evidence, and whether FNP Johnson has a speciality. The ALJ failed to discuss all of the relevant factors under SSR 06-03p.

Because the reasons set forth by the ALJ for rejecting FNP Johnson's opinions are not supported in the record, the ALJ erred.

IV. Remand

In social security cases, remands may be for additional proceedings or for an award of benefits. *E.g., Garrison*, 759 F.3d at 1019 (explaining that if "additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded[,]" but "in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits") (internal quotation marks omitted).

To determine which type of remand is appropriate, the Ninth Circuit uses a three-part test.

*Id.* at 1020; *see also Treichler v. Comm'r*, 775 F.3d 1090, 1100 (2014) ("credit-as-true" rule has three steps). First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion. *Garrison*, 759 F.3d at 1020. Second, the record must be fully developed and further administrative proceedings would serve no useful purpose. *Id.* Third, if the case is remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled. *Id.* To remand for an award of benefits, each part must be satisfied. *Id.; see also Treichler*, 775 F.3d at 1101 (when all three elements are met, "a case raises the 'rare circumstances' that allow us to exercise our discretion to depart from the ordinary remand rule" of remanding to the agency).

Plaintiff argues that remand for an award of benefits is warranted here because the ALJ failed to provide legally sufficient reasons for rejecting the two medical practitioners' opinions and his subjective testimony, the record is fully developed and further administrative proceedings would serve no useful purpose, and if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. Defendant argues that "there are conflicts and ambiguities in the record." Def.'s Br. 11. Continuing, Defendant asserts that "[a]s the ALJ found, the statements of Plaintiff and her providers conflicted with the treatment records." *Id.* Defendant contends that if Plaintiff is disabled, "the ALJ must determine the timing and duration of disability." *Id.*

The first step of the three-part test is met given that the ALJ provided legally insufficient reasons to reject the opinions of FNP Johnson and Dr. Lowengart, as well as Plaintiff's subjective limitations testimony. As to the second step, neither party does a sufficient job of addressing whether the record is fully developed. Defendant points to unspecified conflicts and ambiguities

in the record which the ALJ relied on and which I have now determined were not fully supported in the record. Plaintiff's conclusory statement that the record is fully developed is similarly unhelpful.

My review of the record shows that there are issues requiring further development. First, although Plaintiff alleges an onset date of 2012, there is evidence in the record that Plaintiff himself reported experiencing diabetic neuropathy symptoms only since October 2014. Tr. 783 (April 2016 statement by Plaintiff to examining podiatrist James Holdermann, D.P.M. that his neuropathy symptoms have been present since October 2014). Thus, to the extent the record establishes disability, the alleged onset date needs to be determined.

Second, while the ALJ erred by pointing to records as showing normal physical examinations without further specification and which clearly contained abnormal findings, some of those records did indicate that Plaintiff had no sensory deficit. The cited records are from a particular period beginning in August 2015 to March 2016. It is unclear to the Court if "no sensory deficit" is inconsistent with Plaintiff's allegations of burning and tingling pain caused by his peripheral neuropathy. This issue needs further exploration upon remand. Moreover, these findings need to be reconciled with other evidence in the record establishing sensory deficits in Plaintiff's lower extremities and feet. *E.g.*, Tr. 334 (Nov. 2014 examination by rehabilitation medicine specialist Jeffery Solomon, D.O., stating that the "sensory exam reveals reduced light touch in left saphenous nerve distribution and bilateral feet and toes. The latter show reduced light touch and vibration sense."); Tr. 349 (Dr. Solomon's patient instructions, based on objective testing, stating "you have a combination of diabetic neuropathy that affects the feeling in the feet and legs, impairs PROPRIOCEPTION, which affects balance, and causes nerve pain"); Tr. 375

(March 2015 EMG studies showing mixed distal polyneuropathy consistent with diabetic neuropathy); Tr. 539 (March 2015 exam by Dr. Lowengart showing reduced sensation in the left foot and left outer thigh and right foot to the ankle); Tr. 785 (April 2016 examination by Dr. Holdermann noting that light touch to the feet was "noticeably diminished," particularly throughout the forefoot area of the left and right foot).

Third, the record contains the report of a physical exam along with a functional assessment, performed in February 2018, after the ALJ issued his decision. Tr. 9-16. It is unclear whether this was submitted to the Appeals Council. The Appeals Council appears to have not made it a part of the record. The ALJ should be given the opportunity to consider this evidence upon remand.

Although the ALJ erred, the record requires further development. Thus, the second step of the three-part test is unsatisfied, making remand for benefits inappropriate.

CONCLUSION

The Commissioner's decision is reversed and this case is remanded for additional proceedings.

IT IS SO ORDERED.

Dated this _____16_____ day of _____November_____, 2019

_____
Marco A. Hernandez
United States District Judge